# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71562-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID ANTHONY JOHNSON, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: July 27, 2015 |
| | ) | |

Cox, J. — David Johnson appeals his conviction of 36 counts of first and second degree theft, challenging the sufficiency of the evidence supporting 5 counts and seeking a new trial on the remaining convictions. The State presented sufficient evidence to support the convictions. Any reference to his pre-arrest silence was harmless. Johnson fails to demonstrate ineffective assistance of counsel. We affirm.

From 2000 to 2010, Silas Potter worked in the facilities department of the Seattle School District. As coordinator of the District's Historically Underutilized Businesses Program (HUB) and Regional Small Business Development Program (RSBDP), Potter managed efforts to increase participation of minority-owned small businesses in publicly funded construction projects. In June 2010, the District's internal auditor discovered that a $35,000 check intended for RSBDP had been deposited in Potter's personal bank account. Although the money was returned, the Washington State Auditor's office began an investigation and

discovered inconsistencies in records relating to a personal services contract between the District and a business called Grace of Mercy, owned by David Johnson. Ultimately, the State charged Potter and Johnson with 36 counts of first and second degree theft by color or aid of deception based on checks paid by the District to Grace of Mercy between May 2007 and June 2010 for a total of $168,275.

At trial, Potter testified that he met Johnson in 2006, when Johnson was installing security cameras in certain District properties. Potter assisted Johnson in obtaining contracts with the District for his company, Allstate Surveillance, for additional camera installation projects. In April 2007, Potter approved a personal services contract between the District and Grace of Mercy, with Johnson listed as Executive Director, in the amount of $20,800 for services to be performed between March 1 and August 31, 2007. In a description of its scope of work attached to the contract, Grace of Mercy was to work with "existing agencies," "community based organizations," and "firms" in Tacoma and Pierce County to "implement" RSBDP and "raise awareness" for HUB, develop a "working list of interested firms," screen and assess those firms, participate in "implementation" meetings, and meet with the program manager to "insure and assess the progress towards the goals and objectives of the program."

Potter testified that under the initial Grace of Mercy contract, Johnson was to perform "outreach" in the Tacoma area by talking to contractors and "showing them information" about the program. Potter could not describe Johnson's qualifications for such work beyond knowing "a lot of contractors." Potter testified

2

that Johnson did not meet regularly with him or report to him about any actual outreach efforts and that Johnson did not attend any of the weekly group meetings he conducted with other personal service contractors who were engaged in outreach. Potter also testified that he certified Johnson's invoices for payment by the District without reading the descriptions of his activities or verifying that he had performed the work for which he was billing.

In the following months, Potter approved contract modifications and new contracts increasing the expected dollar amounts and extending the timeframe for services to be performed by Grace of Mercy. Potter testified that he met with Johnson at a Denny's restaurant in September or October of 2007 to discuss a new District requirement that personal service contractors engaged in outreach must also teach classes for small business owners interested in participating in public construction projects. According to Potter, he and Johnson agreed to bill the District as if Johnson were actually teaching the classes and then split the money. For the next several months, Johnson submitted invoices listing classes he claimed to have taught and Potter certified the invoices for payment by the District. Potter admitted that he later began drafting Johnson's invoices and forging Johnson's signature before certifying the invoices for payment. Potter testified that Johnson gave him cash after the District paid each invoice.

Each of Johnson's first four invoices lists 36 hours at $100 per hour for having a "community outreach session with prospective firms;" assessing a total of 45 firms "per SSD requirements" and giving "information for HUB roster;" and meeting "with Mr. Potter weekly to assess program." The second, third, and

fourth invoices indicate Johnson "gave workshop" each month for a total of 49 firms and "worked with contractor on proposal for ... bid" or "on estimating project" for Pierce Transit, Sound Transit, or Pierce County. The fifth invoice lists 51 hours at $100 per hour for the same activities including working with "12 contractors," giving a workshop for "24 firms," assessing "10 firms," giving a "Seminar on Business development" for "14 firms," and "Data entry to compile outreach efforts and to build spreadsheet of firms." The invoices do not include dates or locations for any of these activities or identify any contractors or firms by name.

Cheryl Graves, who worked as Potter's assistant in 2007, testified that she attended RSBDP training classes as well as Potter's weekly group meetings, which she described as "mandatory," with personal service contractors. Although she recalled seeing Johnson at some of the classes "early on," Johnson did not teach any class, did not attend the mandatory weekly contractor meetings, and did not meet on a weekly basis individually with Potter. Graves testified that Johnson did not report anything to her regarding his outreach efforts and that he never provided her with any data regarding firms to enter into the database that she maintained.

Ralph Ibarra testified that he performed outreach and training work for HUB and RSBDP from 2006 or 2007 until 2010. Ibarra attended weekly meetings with Potter and other personal services contractors, including Eddie Rye, to "communicate those different activities that we were engaged in," and "to brief not only one another, but also Mr. Potter, and the Seattle Public Schools

employees so they would know what was going on and what was expected."[1] Ibarra testified that Johnson was not present at any of the many meetings he attended with Potter and other personal services contractors and training instructors over the years he worked for HUB and RSBDP. Rye, who also worked for HUB and RSBDP as a personal services contractor from 2007 to 2010, testified that he met weekly with Potter and other personal services contractors such as Ibarra to discuss the duties each performed and to coordinate efforts. At the time of trial, Rye had never met Johnson.

Johnson presented the testimony of Seven Hobbs, who identified himself as a maintenance worker and owner of a non-profit agency inspired by Johnson. Hobbs had known Johnson for 28 years but became closer friends with him in 2008, when he attended three classes provided by RSBDP at Johnson's suggestion. Although he invited other contractors to participate in the classes, he did not pursue any contract work with the District. Tommy Nicholson, the owner of a carpet cleaning business, testified that he attended a class in Seattle at Johnson's urging but did not find it helpful to his business. Although he could not recall the specific date, he believed he attended the class in 2006. Thomas Roundtree, a former general contractor, testified that he attended approximately "a dozen" RSBDP classes in Seattle in 2008 based on Johnson's recommendation and that he invited other business associates to attend. Raymond Montgomery, an owner of a janitorial business, testified that he went to 6 or 7 RSBDP classes in Seattle in 2008 or 2009.

---

[1] Report of Proceedings (Oct. 31, 2013) at 147-48.

Johnson denied reading or signing the description of his scope of work attached to the contract or the invoices produced by the State at trial. He produced different documents to support his understanding of his contract with the District and testified that he only requested payment for tasks he actually performed. Johnson testified that he attended RSBDP classes to become familiar with all the information offered. Then he created booklets and flyers by copying District materials and adding a coversheet or contact information referring to Grace of Mercy. Johnson testified that he handed out these documents at Home Depot and Lowe's, "where all the contractors are." Johnson claimed that he met with Potter occasionally "for the first six months," but then Potter was not available so he "always left [his] leads and [his] schedule there at the front desk." Johnson denied meeting Potter at a Denny's restaurant or agreeing to give Potter a share of his earnings. Johnson testified that he never taught classes, never submitted invoices claiming to have taught classes, and never agreed that Potter should submit such invoices on his behalf. Johnson also testified that he loaned Potter money on two occasions, he gave Potter blank checks to reimburse another contractor Potter had added to certain Grace of Mercy invoices, and he made donations to Potter's church.

The jury convicted Johnson as charged and the trial court imposed a standard range sentence. Johnson appeals.

## SUFFICIENCY OF THE EVIDENCE

Johnson argues that the State failed to present sufficient evidence to support the first five convictions of theft in the first degree because all the

evidence demonstrated that Johnson actually performed the outreach work specified in his personal service contract before October 2007. He claims that there was no deception because Johnson performed outreach work and submitted accurate invoices. We disagree.

The due process clause of the Fourteenth Amendment of the United States Constitution requires that the State prove beyond a reasonable doubt every element of a crime.[2] To determine whether the evidence is sufficient to sustain a conviction, this court must determine "whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt."[3] A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all inferences that can reasonably be drawn from the evidence.[4] On issues concerning conflicting testimony, credibility of witnesses, and persuasiveness of the evidence, this court defers to the jury.[5] Circumstantial evidence and direct evidence are considered equally reliable when weighing the sufficiency of the evidence.[6]

To convict Johnson of each of the first five counts of theft in the first degree as charged, the State had the burden of proving beyond a reasonable doubt that, together with Potter, he committed theft of more than $1,500 "by color and aid of deception."[7] The trial court instructed the jury:

---

[2] In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).
[3] State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009).
[4] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).
[5] State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).
[6] State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).
[7] Former RCW 9A.56.030(1)(a) (Laws of 2007, ch. 199, § 3).

7

By color or aid of deception means that the deception operated to bring about the obtaining of the property. It is not necessary that deception be the sole means of obtaining the property.

...

Deception occurs when an actor knowingly creates or confirms another's false impression which the actor knows to be false or fails to correct another's impression which the actor previously has created or confirmed or prevents another from acquiring information material to the disposition of the property involved or promises performance which the actor does not intend to perform or knows will not be performed.[8]

Here, a jury could find beyond a reasonable doubt that Potter and Johnson knowingly used deception to induce the District to enter and make payments on a personal services contract for services that Johnson did not perform even before making an explicit agreement to present false invoices and share the proceeds in October 2007. Potter and other State witnesses identified the invoices supporting each of the first five payments. Potter certified the invoices for payment without verifying whether Johnson actually performed any of the activities described. Johnson denied any knowledge of the invoices and did not testify that he performed the work described in the invoices. Instead, he testified that he spent 25 hours each week handing out flyers to strangers in front of Home Depot and Lowe's or encouraging his friends to attend classes. The State's witnesses testified that Johnson did not engage in any activities similar to those performed by the other personal services contractors. None of the State's witnesses recognized the documents Johnson provided at trial to explain his different understanding of his contract. The State also provided evidence that Johnson gave Potter money, described as loans or reimbursements, before October 2007, although Potter denied any explicit financial agreement until after

---

[8] RCW 9A.56.010(4), (5)(a)-(c), (e); Clerk's Papers at 147-48.

that date. Although largely circumstantial, this evidence, viewed in the light most favorable to the State, would allow a rational trier of fact to find the essential elements of the first five counts as charged beyond a reasonable doubt.

The jury was entitled to disbelieve Johnson's evidence and explanation for his actions and find as it did. Resolution of the direct conflicts between Johnson's and Potter's differing versions of events required credibility determinations that we do not review on appeal.

Given our resolution of his challenge to the sufficiency of the evidence, we need not address Johnson's challenge to the restitution order based on the same claim.

## FIFTH AMENDMENT

Johnson argues that Detective Keith Savas made an improper comment during his trial testimony on Johnson's pre-arrest exercise of his constitutional right to silence. He claims the comment was particularly improper because Detective Savas also testified that Potter and Johnson's former girlfriend agreed to his requests for interviews and confessed their crimes. We reject this claim because he fails to show prejudice, even if we assume a constitutional violation.

The State may not comment on a defendant's Fifth Amendment right to remain silent.[9] An impermissible comment on silence occurs when the State uses the defendant's silence "as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt."[10] "A mere reference to silence,

---

[9] State v. Lewis, 130 Wn.2d 700, 705, 927 P.2d 235 (1996).
[10] Id. at 707.

9

however, is not necessarily an impermissible comment and, therefore, not reversible constitutional error, absent a showing of prejudice."[11]

A direct comment, such as when a witness or state agent refers to the defendant's invocation of his or her right to remain silent, is reviewed for prejudice using a harmless error beyond a reasonable doubt standard.[12] An indirect comment, such as when a witness or state agent references a comment or action by the defendant which could be inferred as an attempt to exercise the right to remain silent, is reviewed using the lower, nonconstitutional harmless error standard to determine whether no reasonable probability exists that the error affected the outcome.[13]

Johnson challenges the following portion of the detective's testimony:

[PROSECUTOR]: Did you attempt to contact Mr. Johnson?

[DETECTIVE]: Yes, I did.

[PROSECUTOR]: How many times did you do that?

[DETECTIVE]: At least six times.

[PROSECUTOR]: How did you go about attempting to contact Mr. Johnson?

[DETECTIVE]: I went to his house a couple of times, I telephoned him at a couple of different telephone numbers, and e-mailed him.

---

[11] State v. Slone, 133 Wn. App. 120, 127, 134 P.3d 1217 (2006).

[12] State v. Pottorff, 138 Wn. App. 343, 346-47, 156 P.3d 955 (2007).

[13] Id. at 347; see, e.g., State v. Sweet, 138 Wn.2d 466, 480-81, 980 P.2d 1223 (1999) (officer's testimony that defendant said he would be willing to take a polygraph examination and provide a written statement when neither were introduced at trial was "mere reference to silence" rather than "comment" on silence and not reversible error absent showing of prejudice).

[PROSECUTOR]: Did he respond to any of the telephone messages or e-mails?

[DETECTIVE]: No.[14]

Johnson claims that his attorney's continuing objection to all of the detective's testimony on the grounds of relevance and unfair prejudice was sufficient to preserve his claim of error. The State argues that Johnson waived the error by failing to object and cannot demonstrate a "manifest error affecting a constitutional right."[15]

Assuming, without deciding, that he has properly raised this issue, Johnson does not show that the testimony was prejudicial. The State did not use it as substantive evidence of guilt.[16]

The State did not invite the jury to infer guilt from Johnson's failure to respond to any particular telephone message or e-mail. And the prosecutor did not refer to Detective Savas's testimony in closing argument. Significantly, there was substantial evidence of Johnson's guilt presented at trial. In sum, Johnson fails to show that the alleged error was prejudicial.

---

[14] Report of Proceedings (Oct. 31, 2013) at 134.

[15] RAP 2.5(a)(3); see State v. Kalebaugh, __ P.3d __, 2015 WL 4136540, *2 (July 9, 2015) ("This exception strikes a careful policy balance. On the one hand, a procedural rule should not prevent an appellate court from remedying errors that result in serious injustice to an accused. At the same time, if applied too broadly RAP 2.5(a)(3) will devalue objections at trial and deprive judges of the opportunity to correct errors as they happen.").

[16] Cf., State v. Easter, 130 Wn.2d 228, 233-34, 922 P.2d 1285 (1996) (testifying about his conversation with defendant near scene of accident, officer called defendant a "smart drunk," and characterized his silence as evasive and evidence of guilt; and prosecutor repeated "smart drunk" several times during closing).

For the same reason, we also reject Johnson's alternative argument that his trial counsel was ineffective for failing to object to this testimony. Johnson cannot show that failure to object to this testimony was prejudicial.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Relying on State v. McGill,[17] Johnson contends his attorney provided ineffective assistance of counsel by failing to cite particular authorities supporting a claim that the operation of RCW 9.94A.589 resulted in a sentence that was clearly excessive under RCW 9.94A.535(1)(g), warranting a downward exceptional sentence. We disagree.

To demonstrate ineffective assistance, Johnson must show that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient representation.[18] We strongly presume that counsel's representation was not deficient.[19] If a defendant fails to make either of the two showings, the inquiry ends.[20] If counsel's conduct can be characterized as legitimate trial strategy or tactics, counsel's performance is not deficient.[21]

Johnson cannot establish deficient performance. Unlike McGill, this case does not involve an erroneous application of the law and nothing in the record

---

[17] 112 Wn. App. 95, 102, 47 P.3d 173 (2002) (where trial court indicated inclination to impose exceptional sentence downward but incorrectly believed it lacked ability to do so, defense counsel was ineffective for failing to cite case law that would allow imposition of exceptional sentence).
[18] State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).
[19] State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).
[20] State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).
[21] Id. at 863.

suggests the trial court was unaware of its decision-making authority or discretion under RCW 9.94A.535(1)(g) or the relevant case law. Defense counsel cited RCW 9.94A.535(1)(g) in its sentencing memorandum and urged the court exercise its discretion to impose either a first time offender sentence or an exceptional sentence below the standard range, "which you are authorized to do and which . . . [is] fully warranted by all the evidence you've heard as well as the arguments of counsel."[22] Counsel also discussed and distinguished the authority identified by the prosecutor, State v. Kinneman,[23] in his double jeopardy argument. Essentially, Johnson faults his attorney for failing to differently or more persuasively distinguish Kinneman in support of his alternative request for a downward exceptional sentence.[24] Because Johnson cannot demonstrate that counsel's decision to focus his argument on the alternative he viewed as more promising was not strategic, he has accordingly not overcome the strong presumption that counsel's representation was not deficient.

### STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In a statement of additional grounds, Johnson claims that the trial court abused its discretion by refusing to allow "co-counsel when I went pro-se" and allowing the prosecutor "to remove jury instructions" on "lesser charges." He also states that the trial court should have held a suppression hearing. Because

---

[22] Report of Proceedings (Feb. 7, 2014) at 54.

[23] 120 Wn. App. 327, 338, 84 P.3d 882 (2003) (state had discretionary authority to charge separate count of theft for each unauthorized withdraw from trust account; defendant not subject to double jeopardy for 67 theft convictions where each was based on a discrete act).

[24] Id. at 341-48 (reversing downward exceptional sentence based on RCW 9.94A.535(1)(g) as not supported by fact or law where cumulative effect of 67 counts of theft of over $200,000 was foreclosure of properties and additional substantial loss to secondary victim).

13

these statements do not sufficiently inform the court of the nature and occurrence of the alleged error, we cannot review them.[25]

We affirm the judgment and sentence.

_Cox, J._

WE CONCUR:

_Spearman, C.J._

_Appelwick_

---

[25] RAP 10.10(c).